T.C. Memo. 2000-372

UNITED STATES TAX COURT

JAMES D. BARBER AND BETTY L. BARBER, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 7777-95, 7778-95.          Filed December 7, 2000.

<u>George W. Gregory</u>, for petitioners.

<u>Alexandra E. Nicholaides</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

ARMEN, <u>Special Trial Judge</u>:  In so-called affected items notices of deficiency, respondent determined additions to tax to petitioners' Federal income taxes for the years and in the amounts as shown below:

| | Additions to tax | | |
|---|---|---|---|
| | Sec. 6653(a)(1) | Sec. 6653(a)(2) | Sec. 6659 |
| Year | | | |
| 1982 | $1,162 | [1] | $5,236 |
| 1983 | 10 | [1] | — |

[1] 50 percent of the interest payable with respect to the portion of the underpayment that is attributable to negligence or intentional disregard of rules or regulations. The underpayments for the years in issue were determined and assessed pursuant to a partnership-level proceeding. See secs. 6221-6233. In the present cases, respondent determined that the entire underpayment for each of the years in issue is attributable to negligence or intentional disregard of rules or regulations.

Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the taxable years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

After concessions by petitioners,[1] the issues for decision

---

[1] Petitioners do not contest that the Sentinel EPS recyclers that are involved in these cases were overvalued. See Gottsegen v. Commissioner, T.C. Memo. 1997-314; see also Ulanoff v. Commissioner, T.C. Memo. 1999-170. Petitioners therefore concede (in par. 1. of the stipulation of facts) that they are liable for the addition to tax for valuation overstatement under sec. 6659 for 1982. To the extent that petitioners' concession may not extend to sec. 6659(e), and assuming arguendo that petitioners properly raised an issue under that section, then we decide such issue in respondent's favor. See, e.g., Addington v. Commissioner, 205 F.3d 54, 62 (2d Cir. 2000), affg. Sann v. Commissioner, T.C. Memo. 1997-259; Ulanoff v. Commissioner, supra.

(continued...)

are as follows:

(1) Whether petitioners are liable for additions to tax under section 6653(a)(1) and (2) for negligence or intentional disregard of rules or regulations.  We hold that petitioners are so liable.

(2) Whether petitioners are entitled to the terms of the Plastics Recycling Project Settlement Offer proffered by respondent in October 1988 to the tax matters partner of Whitman Recycling Associates.  We hold that petitioners are not so entitled.

## FINDINGS OF FACT

Some of the facts have been stipulated, and they are so found.  The stipulated facts and attached exhibits are incorporated herein by this reference.  Petitioners resided in Plymouth, Michigan, at the time that each of their petitions was filed with the Court.

---

[1](...continued)
Moreover, it would appear that petitioners have abandoned their contention regarding the statute of limitations (the so-called Davenport issue) in view of the recent affirmance of this Court's opinion on that issue by the Court of Appeals for the Eleventh Circuit.  See Davenport Recycling Associates v. Commissioner, 220 F.3d 1255 (11th Cir. 2000), affg. T.C. Memo. 1998-347; see also Klein v. United States, 86 F. Supp.2d 690 (E.D. Mich. 1999); Clark v. United States, 68 F. Supp.2d 1333, 1342-1346 (N.D. Ga. 1999); Kohn v. Commissioner, T.C. Memo. 1999-150.  However, if we are mistaken in this regard, then we refer the parties to paragraphs 1 and 22 of the stipulation of facts, and we decide the Davenport issue in respondent's favor based on the foregoing precedent.

A.   The Whitman Transactions

These cases are part of the Plastics Recycling group of cases.  In particular, the additions to tax arise from the disallowance of losses, investment credits, and energy credits claimed by petitioners with respect to a partnership known as Whitman Recycling Associates (Whitman or the partnership).

For a detailed discussion of the transactions involved in the Plastics Recycling group of cases, see Provizer v. Commissioner, T.C. Memo. 1992-177, affd. per curiam without published opinion 996 F.2d 1216 (6th Cir. 1993).  The underlying transactions involving the Sentinel recycling machines (recyclers) in petitioners' cases are substantially identical to the transactions in Provizer v. Commissioner, supra, and, with the exception of certain facts that we regard as having minimal significance, petitioners have stipulated substantially the same facts concerning the underlying transactions that were described in Provizer v. Commissioner, supra.

In a 4-step series of simultaneous transactions closely resembling those described in the Provizer case and stipulated by the parties herein, Packaging Industries of Hyannis, Massachusetts (PI) manufactured and sold[2] four Sentinel

_____

[2]  Terms such as sale and lease, as well as their derivatives, are used for convenience only and do not imply that the particular transaction was a sale or lease for Federal tax purposes.  Similarly, terms such as joint venture and agreement
(continued...)

EPS[3] recyclers to ECI Corporation (ECI) for $1,520,000 each. ECI simultaneously resold the recyclers to F&G Corporation (F&G) for $1,750,000 each. F&G simultaneously leased the recyclers to Whitman. Finally, Whitman simultaneously entered in a joint venture with PI and Resin Recyclers Inc. (RRI) to "exploit" the recyclers and place them with end-users. Under this latter arrangement, PI was required to pay Whitman a monthly joint venture fee.

For convenience, we refer to the series of transactions between and among PI, ECI, F&G, Whitman, and RRI as the Whitman transactions.

The sales of the Sentinel EPS recyclers from PI to ECI were financed using 12-year nonrecourse notes. The sales of the recyclers from ECI to F&G were financed using 12-year "partial recourse" notes; however, the recourse portion of the notes was payable only after the first 80 percent of the notes, the

_____

[2](...continued)
are also used for convenience only and do not imply that the particular arrangement was a joint venture or an agreement for Federal tax purposes.

[3] EPS stands for expanded polystyrene. The case of Provizer v. Commissioner, T.C. Memo. 1992-177, affd. per curiam without published opinion 996 F.2d 1216 (6th Cir. 1993), involved Sentinel expanded polyethylene (EPE) recyclers. However, the EPS recycler partnerships and the EPE recycler partnerships are essentially identical. See Davenport Recycling Associates v. Commissioner, T.C. Memo. 1998-347, affd. 220 F.3d 1255 (11th Cir. 2000); see also Gottsegen v. Commissioner, T.C. Memo. 1997-314 (involving both the EPE and EPS recyclers); Ulanoff v. Commissioner, T.C. Memo. 1999-170 (same).

nonrecourse portion, was paid.  No negotiations for the price of the recyclers took place between, or among, PI, ECI and F&G.

At the closing of the Whitman partnership, PI, ECI, F&G, Whitman, and RRI entered into arrangements whereby PI would pay a monthly joint venture fee to Whitman, in the same amount that Whitman would pay as monthly rent to F&G, in the same amount that F&G would pay monthly on its note to ECI, in the same amount that ECI would pay monthly on its note to PI.  Further, in connection with the closing of the Whitman partnership, PI, ECI, F&G, Whitman, and RRI entered into offset agreements providing that the foregoing payments were bookkeeping entries only and were never in fact paid.  Also in connection with the closing of the Whitman partnership, PI, ECI, F&G, Whitman, and RRI also entered into cross-indemnification agreements.

B.   Individuals Involved

Richard Roberts (Roberts) was a businessman and the general partner in a number of limited partnerships that leased Sentinel EPE recyclers.  Roberts was also a 9-percent shareholder in F&G, the corporation that leased the recyclers to Whitman in the Whitman transactions.

Raymond Grant (Grant) was an investment banker, attorney, and accountant.  Grant was also the president and sole owner of ECI, the corporation that sold the recyclers to F&G in the Whitman transactions.

From 1982 through 1985, Roberts and Grant were in the business of promoting tax-sheltered investments. Roberts and Grant also served as general partners in other investments. Before the Whitman transactions, Roberts and Grant were clients of the accounting firm H.W. Freedman & Co. (Freedman & Co.).

Harris W. Freedman (Freedman), a certified public accountant and the named partner in Freedman & Co., was the president, chairman of the board, and 9.1 percent owner of F&G. Freedman was experienced with leveraged leasing, and he owned 94 percent of a Sentinel EPE recycler.

Freedman & Co. prepared the tax returns for ECI, F&G, and Clearwater Group, the partnership that was involved in Provizer v. Commissioner, supra. Although Freedman & Co. did not prepare the initial financial projections included in the Whitman private placement offering memorandum, Freedman & Co. reviewed those financial projections and made suggestions as to format and substance.

Freedman & Co. also provided tax services to John D. Bambara (Bambara). Bambara was the president and sole owner of First Massachusetts Equipment Corp. (FMEC Corp.), another entity that was involved in Provizer v. Commissioner, supra. Bambara was also the president of PI and a member of its board of directors and with his wife and daughter also owned 100 percent of the stock of PI, the corporation that sold the recyclers to ECI in

the Whitman transactions.

Elliot I. Miller (Miller), a practicing attorney who was experienced in tax matters, was the corporate counsel to PI. Miller represented Grant personally and Grant's clients who invested in programs that Grant promoted. Miller met Grant in the 1970's when Grant was involved in marketing a coal mine. Miller was also a 9.1-percent owner of F&G.

John Y. Taggert (Taggert) was a well-known tax attorney, the head of the tax department of the New York law firm of Windells, Marx, Davis & Ives, and an adjunct professor of tax law at the New York University Law School. Taggert had been acquainted with Miller for many years before 1982. Miller recommended that Roberts employ Taggert and his firm as counsel to the general partner in the initial Plastics Recycling partnership. Taggert and other members of his firm prepared the offering memorandum, tax opinion, and other legal documents for the initial Plastics Recycling partnership, for the Clearwater partnership, and for about 16 other Plastics Recycling partnerships, including Whitman. Taggert owned a 6.66-percent interest in a second-tier Plastics Recycling partnership.

Robert Gottsegen (Gottsegen) was a businessman active in the plastics industry and a longtime business associate of Bambara. Gottsegen was the sole owner of RRI, the corporation that was involved in the joint venture in the Whitman transactions, and a

9.1-percent owner of F&G. Gottsegen was the owner of several Sentinel recyclers and also the petitioner in Gottsegen v. Commissioner, T.C. Memo. 1997-314.

Samuel L. Winer (Sam Winer or Winer) was Whitman's general partner and tax matters partner, as well as a promoter of the partnership. Winer purportedly paid $1,000 for a 1-percent interest in all items of income, gain, deduction, loss, and credit of the partnership.

C.   The Private Offering Memorandum

By a private placement offering memorandum dated September 28, 1982 (the offering memorandum), subscriptions for 18 limited partnership units in Whitman were offered by the partnership's promoter to potential limited partners at $50,000 per partnership unit. Pursuant to the offering memorandum, the limited partners would own 99 percent of Whitman and the general partner, Sam Winer, would own the remaining 1 percent. Also pursuant to the offering memorandum, each limited partner was required to have a net worth (including residence and personal property) in excess of $1 million, or net income in excess of $200,000, for each investment unit.

The offering memorandum stated that Winer would receive $62,000 for administrative and other services to be paid from the proceeds of the private placement offering as "management fees". The offering memorandum also stated that the partnership would

pay "fees of purchaser representatives and selling commissions" from the proceeds of the offering in an amount equal to 10 percent of the aggregate price of the units.  Thus, Winer would earn a 10-percent commission upon selling an interest in the partnership.  In addition, the offering memorandum stated that Winer could "retain as additional compensation all amounts not paid as purchaser representative fees or sales commissions in connection with the Offering".

The face of the offering memorandum warned, in bold capital letters, that "**THIS OFFERING INVOLVES A HIGH DEGREE OF RISK"**. The offering memorandum also warned that "An investment in the partnership involves a high degree of business and tax risks and should, therefore, be considered only by persons who have a substantial net worth and substantial present and anticipated income and who can afford to lose all of their cash investment and all or a portion of their anticipated tax benefits."  The offering memorandum went on to enumerate significant business and tax risks associated with an investment in Whitman.  Among those risks, the offering memorandum stated: (1) There was a substantial likelihood of audit by the Internal Revenue Service, and the purchase price paid by F&G to ECI might be challenged as being in excess of the fair market value; (2) the partnership had no prior operating history; (3) the management of the partnership's business would be dependent on the services of the

general partner, who had limited experience in marketing

recycling or similar equipment; (4) the limited partners would

have no control over the conduct of the partnership's business;

(5) there were no assurances that market prices for virgin resin

would remain at their current costs per pound or that the

recycled pellets would be as marketable as virgin pellets; and

(6) certain potential conflicts of interest existed.

The offering memorandum informed investors that the Whitman

transactions would be executed simultaneously.

The offering memorandum prominently touted the anticipated

tax benefits for the initial year of investment for an investor

in the partnership.  In this regard, the offering memorandum

stated, in part, as follows:

> The principal tax benefits expected from an
> investment in the Partnership are to be derived from
> the Limited Partner's share of investment and energy
> tax credits and tax deductions expected to be generated
> by the Partnership in 1982.  The tax benefits on a per
> Unit basis are as follows:

|  | Payment | Projected Regular Investment and Energy Tax Credits | Projected Tax Deductions |
|---|---|---|---|
| 1982 | $50,000 | $77,000 | $38,940 |

> The Limited Partners are not liable for any additional
> payment beyond their cash investment for their Units,
> nor are they subject to any further assessment.

The offering memorandum also included a tax opinion prepared

by the law firm of Boylan & Evans concerning tax issues involved

in the Plastics Recycling program.[4]  William A. Boylan (Boylan) and John D. Evans (Evans) were formerly partners at Windells, Marx, Davis & Ives, the law firm that had provided the legal opinion for Sentinel EPE recycler partnerships such as Clearwater, before leaving in 1982 and forming their own law firm.

Also included in the offering memorandum were the reports of two "evaluators", Samuel Z. Burstein (Burstein) and Stanley Ulanoff (Ulanoff).  Burstein was a professor of mathematics at New York University.  Burstein's report concluded that the Sentinel EPS recyclers were capable of continuous recycling.  The report also concluded that the recycling system would yield a material having commercial value.

At the time Ulanoff prepared his report, he was a professor of marketing at Baruch College and also the author of numerous books on technical and marketing subjects.  Ulanoff's report concluded that the price paid by F&G for the Sentinel EPS recyclers, the rent paid by Whitman, and the joint venture profits were fair and reasonable.

Burstein owned a 5.82-percent interest in another Plastics Recycling partnership that leased Sentinel EPS recyclers. Ulanoff owned interests in other Plastics Recycling partnerships

---

[4]  The tax opinion prepared by Boylan & Evans was part of the private offering memoranda of approximately 92 other Sentinel EPS recycler partnerships.

that leased both Sentinel EPS and EPE recyclers.[5]

The offering memorandum represented that Sentinel EPS recyclers were unique machines.  However, they were not.  Several machines capable of densifying low density materials were already on the market in 1982.  Other plastics machines available at that time ranged in price from $20,000 to $200,000, including the Foremost "Densilator", the Nelmor/Weiss Densification System (Regenolux), the Buss-Condux Plastcompactor and the Cumberland Granulator.  See Provizer v. Commissioner, T.C. Memo. 1992-177, and the discussion regarding respondent's experts, infra.  Moreover, the recyclers were incapable of recycling expanded polystyrene by themselves and had to be used in connection with extruders and pelletizers.

D.    Respondent's Experts

At trial, petitioners did not offer expert testimony.  Rather, petitioners stipulated that the Court may adopt its findings regarding the expert testimony and reports of Steven Grossman (Grossman) and Richard S. Lindstrom (Lindstrom) as found in Ulanoff v. Commissioner, T.C. Memo. 1999-170; Gottsegen v. Commissioner, T.C. Memo. 1997-314; and Fine v. Commissioner, T.C. Memo. 1995-222.  In those cases, we found Grossman and Lindstrom to be experts in the fields of plastics, engineering, and

---

[5]  Ulanoff was also the petitioner in Ulanoff v. Commissioner, T.C. Memo. 1999-170.

technical information, and they submitted reports regarding both Sentinel EPS and EPE recyclers.[6]

1. Grossman

Grossman is a professor in the Plastics Engineering Department at the University of Massachusetts at Lowell. He has a bachelor of science degree in chemistry from the University of Connecticut and a doctorate degree in polymer science and engineering from the University of Massachusetts. He also has more than 15 years of experience in the plastics industry, including more than 4 years of experience as a research and development scientist at Upjohn Company in its Polymer Research Group.

Grossman is also a partner in the law firm of Hayes, Soloway, Hennessey, Grossman & Hage, P.C.. The firm practices in the area of intellectual property, including patents, trademarks, copyrights, and trade secret protection.

Grossman's report concerning the value of the Sentinel EPS recyclers discusses the limited market for the recycled plastic material. Grossman concluded that these recyclers were unlikely to be successful products because of the absence of any new technology, the absence of a continuous source of suitable scrap,

---

[6] Grossman and Lindstrom were also found to be experts in Provizer v. Commissioner, T.C. Memo. 1992-177, as well as in a number of other Plastics Recycling cases. See, e.g., Carroll v. Commissioner, T.C. Memo. 2000-184.

and the absence of any established market. Grossman suggested that a reasonable comparison of the products available in the polystyrene industry in 1982 with the Sentinel EPS recyclers reveals that the recyclers had very little commercial value and were similar to comparable products available on the market in component form. For these reasons, Grossman opined that the Sentinel EPS recyclers did not justify the "one-of-a-kind" price tag that they carried.

Specifically, Grossman reported that there were several machines on the market as early as 1981 that were functionally equivalent to, and significantly less expensive than, the Sentinel EPS recyclers. These machines included: (1) The Japan Repro recycler, available in 1981 for $53,000; (2) the Buss-Condux Plastcompactor, available before 1981 for $75,000; (3) Foremost Machine Builders' "Densilator", available from 1978-1981 for $20,000; and (4) the Midland Ross Extruder, available in 1980 and 1981 for $120,000. Grossman observed that all of these machines were "widely available".

Grossman examined both the Sentinel EPS recycler and a Japan Repro recycler and found that the construction of the two machines was "nearly identical". Further, Grossman concluded that the recycled polystyrene produced by both machines would also be nearly identical. In Grossman's opinion, neither the Japan Repro recycler nor the Sentinel EPS recycler represented "a

serious effort at recycling" because the end product from both machines was not completely devolatized and required further processing. It was also Grossman's opinion that an individual who seriously wanted to recycle would not purchase either of these machines.

Grossman's opinion regarding the Sentinel EPS recycler was based on his personal examination of a Sentinel EPS recycler, as well as the descriptions of such recyclers as set forth in the writings of other professionals. Grossman did not, however, observe the Sentinel EPS recycler in actual operation.

Finally, Grossman reported on the relationship between the plastics industry and the petrochemical industry. Grossman noted that although the development of the petrochemical industry is a contributing factor in the growth of the plastics industry, the two industries have a "remarkable degree of independence". Grossman observed that the "oil crisis" in 1973 triggered "dire" predictions about the future of plastics that had not been fulfilled in 1981. Grossman stated that the cost of a plastic product depends, in large part, on technology and the price of alternative materials. Grossman's studies concluded that a 300-percent increase in oil prices results in a 30- to 40-percent increase in the cost of plastic.

Grossman did not specifically value the Sentinel EPS recycler. However, as previously stated, Grossman concluded that

existing technology was available that provided equivalent capability of recycling polystyrene. Specifically regarding the Sentinel EPS recycler, Grossman also concluded that recycling equipment that achieved the same result as the Sentinel EPS recycler sold for about $50,000 during the relevant period.

2. Lindstrom

Lindstrom graduated from the Massachusetts Institute of Technology with a bachelor's degree in chemical engineering. From 1956 until 1989, Lindstrom worked for Arthur D. Little, Inc., in the areas of process and product evaluation and improvement and new product development, with special emphasis on plastics, elastomers, and fibers. At the time of trial, Lindstrom continued to pursue these areas as a consultant.

In his report, Lindstrom determined that several different types of equipment capable of recycling expanded polystyrene were available and priced between $25,000 and $100,000 in 1982. With respect to the Sentinel EPS recycler in 1982, Lindstrom stated: "Several machines were available that could reprocess EPS into higher quality, more useful, higher value product and these machines or processing systems cost $50,000 to $100,000."

Lindstrom examined the Buss-Condux Plastcompactor and the Regenolux. Lindstrom found that these machines were functionally equivalent to the Sentinel EPS recycler and were available in the years and at the prices reported by Grossman, detailed supra.

Lindstrom also reported that various equipment companies, such as the Cumberland Engineering Division of John Brown Plastics Machinery, were willing to provide customized recycling programs to companies at a minimum cost of $50,000.

Lindstrom found that the Sentinel EPS recycler could process between 100 and 200 pounds of plastic per hour.

Lindstrom observed a Sentinel EPS recycler in operation and was allowed to inspect the machine closely.  Lindstrom estimated the manufacturing cost of the Sentinel EPS recycler to be approximately $20,000 and the market value of the machine to be approximately $25,000.

E.    Fair Market Value of the Recyclers

At all relevant times, the fair market value of the Sentinel EPS recycler did not exceed $50,000 per machine.[7]

F.    Petitioners and Their Introduction to Whitman

Jim Barber (petitioner) is a well-educated individual, having graduated from the University of Michigan in 1957 with a bachelor of science degree in mechanical engineering.  For most of his career, petitioner has worked in the field of industrial automation.  In 1982, petitioner was employed by the Bendix Corp., and he was about 48 years old.

---

[7] Our finding is based on the expert reports and testimony of Grossman and Lindstrom, as stipulated by the parties.  We note that petitioners independently stipulated that the Sentinel EPS recycler had a maximum value of between $30,000 to $50,000 per machine.  That latter stipulation is consistent with our finding.

Petitioner Betty L. Barber is also a well-educated individual. During the years in issue, she was a college professor at Eastern Michigan University.

Petitioners are financially successful. During the years in issue, they received both compensation for services and income from other sources in the total amount (exclusive of partnership losses) as follows:

| 1982 | 1983 |
|------|------|
| $90,990 | $70,573 |

Petitioner is a relatively sophisticated investor, and he generally made the investment decisions for his family.

Prior to purchasing a partnership interest in Whitman, petitioner's investment portfolio included a variety of interests. For example, in 1978, petitioner invested in University Associates, a real estate partnership that owned an apartment complex in San Diego, California. In 1979 through 1981, petitioner invested in several oil and gas partnerships, including Winer Development Co. In addition, petitioner maintained an account with a national brokerage firm and invested in publicly held securities. He also owned a receivable in the form of a land contract.

Petitioner has a younger brother, John Barber (petitioner's brother), who, like petitioner, graduated from the University of Michigan with a degree in engineering. Since the mid-1970's, petitioner's brother has been enrolled to practice before the

Internal Revenue Service (an enrolled agent) and has prepared tax returns. Although petitioner has occasionally consulted with his brother, by telephone, on "complex" tax matters, petitioner has never asked his brother to prepare petitioners' tax returns. Also, petitioner has never disclosed details regarding his own personal financial status to his brother. However, petitioner has asked his brother for investment advice, and his brother has offered such advice. For example, it was petitioner's brother who recommended that petitioner invest in University Associates in 1978, and it was petitioner's brother who put petitioner in touch with Sam Winer in 1979. Contact with Winer led petitioner to invest in Winer-promoted oil and gas partnerships, including Winer Development Co., from 1979 through 1981. These various Winer-promoter partnerships produced tax benefits.

In September 1982, petitioner contacted Winer and expressed an interest in investing in another oil and gas partnership. Winer recommended instead that petitioner invest in the plastics recycling industry, and Winer provided petitioner with a copy of the offering memorandum for the Whitman partnership. See supra C. In promoting the investment, Winer stated that petitioner would receive tax benefits.

Petitioner looked at the offering memorandum. Petitioner understood that if he invested in Whitman, then Winer, as promoter, would receive a commission based on petitioner's

purchase of an interest in the partnership.

Before making a decision, petitioner asked Winer to send a copy of the offering memorandum to petitioner's brother. Subsequently, petitioner telephoned his brother and, assuming that his brother had read the offering memorandum, asked some questions about making the investment. After petitioner's brother "didn't raise any objections to it", petitioner decided to invest.

In or about October 1982, petitioner signed a subscription agreement and purchased three-tenths of a limited partnership unit (a 1.66 percent interest) in Whitman for $15,000.

Petitioner did not, before signing the subscription agreement and investing in Whitman, seek the advice of any expert in the plastics recycling industry, nor did he talk to anyone involved in the plastics recycling industry. Likewise, petitioner did not make any independent investigation of the fair market value of the Sentinel EPS recycler; rather, he accepted, and did not question, the $1,750,000 per machine value as represented in the offering memorandum.

Petitioner was influenced to sign the subscription agreement by Winer and petitioner's brother. However, Winer did not have an engineering background, and he was not an expert in either plastics materials or plastics recycling. Moreover, Winer did not represent that he possessed specialized knowledge of the

plastics recycling industry, and he had, at most, only limited experience in marketing recycling or similar equipment. Petitioner's brother had no specialized knowledge of the plastics recycling industry, and he had no expertise in appraising either the value of property in general or plastics recycling machines in particular. Petitioner did not know whether his brother had any knowledge regarding the value of the Sentinel EPS recyclers, nor did petitioner know whether his brother talked to anyone in the plastics industry before giving him "advice". Petitioner also did not know whether his brother read the offering memorandum.

At the time that petitioner signed the subscription agreement and invested in Whitman, petitioner did not have any education or work experience in either plastics materials or plastics recycling, nor did petitioner have any specialized knowledge about either the plastics industry in general or the Sentinel EPS recycler in particular.

In contrast, at the time that he signed the subscription agreement, petitioner knew that his investment in Whitman offered immediate tax benefits in excess of his $15,000 investment. Petitioner had not previously made any investment that offered immediate tax benefits in excess of his investment. Petitioner was influenced to invest in Whitman by the tax benefits described in the offering memorandum and the statements made by Winer

regarding such benefits.

G.    Ultimate Finding Regarding Petitioner's Motivation

Petitioner invested in Whitman principally because the investment offered immediate tax benefits in excess of his investment.

H.    Events Leading to the Filing of Petitioners' 1982 Return

Early in 1983, petitioner received from Sam Winer a Schedule K-1 (Partner's Share of Income, Credits, Deductions, etc.) for the Whitman partnership for the taxable year 1982.  The Schedule K-1 disclosed that petitioner's share of Whitman's loss for 1982 was $11,852 and that petitioner's share of the partnership's basis in the 4 EPS recyclers for investment credit purposes was $116,200.  Although these amounts were actually consistent with the tax benefits promised in the offering memorandum, petitioner was sensitive to their magnitude and mindful of the fact that they might flag his investment as a tax shelter.  Petitioner was also uncertain how to convert his share of the partnership's basis in the recyclers into the regular investment tax credit and the energy tax credit on his individual return.  Accordingly, petitioner contacted a certified public accountant for assistance.[8]

The accountant that petitioner contacted was unable to help

_____

[8]  Petitioner did not contact his brother because petitioner did not disclose personal financial information to him.

and suggested instead that petitioner consult a tax attorney. Accordingly, petitioner sought out Gerald Thompson (Thompson), a young attorney who was affiliated with Krandle, Thompson & Mier P.C. (KT&M), a small law firm in Livonia, Michigan.[9] The firm's brochure indicated that the firm specialized in all areas of business and corporation law and taxation. Neither KT&M nor Thompson had any relationship with either Winer or Whitman.

Petitioner provided Thompson with copies of the Whitman offering memorandum and his Schedule K-1.

Thompson did not have any specialized knowledge regarding the plastics recycling industry, and he did not have any specialized knowledge regarding the nontax business aspects of petitioner's Sentinel EPS recycler investment. Further, Thompson did not make any independent attempt to evaluate the Whitman partnership or to value the EPS recycler; rather, he confined himself to the offering memorandum and petitioner's Schedule K-1.

As an attorney, Thompson did not consider himself qualified to provide investment advice, and his practice was not to provide such advice. Thompson did not provide petitioner with any investment advice. Rather, Thompson provided petitioner with a 2-page letter dated April 4, 1983 (Thompson's letter), together with a completed Form 3468 (Computation of Investment Credit) and a copy of an article on partnership audits.

---

[9] Thompson was the son of one of the firm's named partners.

The opening paragraph of Thompson's letter read as follows:

> You have retained us to review the Confidential Private Offering Memorandum ("Memorandum") of Whitman Recycling Associates for the purpose of preparing and advising you with regard to Form 3468 to be filed with your 1982 tax return.  Based upon our review of the Memorandum, we have prepared a Form 3468 as enclosed (with lines 18-27 yet to be completed), showing a full crediting of the amounts shown on your K-1 from the Partnership.  It is our belief that the tax treatment of such items is more likely than not the proper treatment.  However, we do not opine as to any other matters which may or may not be covered in the Memorandum or the opinion of the counsel therein.

Thompson did not consider his letter to be a rousing endorsement of the investment; rather, he considered the investment to be "aggressive", and his letter was replete with "areas of concern" and various disclaimers.  One area of concern focused on the value of the EPS recyclers:

> Obviously, the fair market value ("FMV") of the Sentinel EPS Recyclers ("Recyclers") is important because it is the starting point for determining the amount of credits available to the Partnership. Although I am not in a position to judge the FMV of the Recyclers, the valuation made in the Memorandum is challengeable.  First of all, with regard to Ex. F, [Burstein's and Ulanoff's reports], neither evaluator appears to be primarily a property appraiser, and neither engages in an economic analysis of cost of production of the Recyclers, reasonable profit, comparables, capitalization of income, or other factors normally used in equipment appraisals.

Other areas of concern focused on the step-up in purchase price from ECI to F&G, potential conflicts of interest, possible lack of arm's-length negotiations, F&G's purported $7 million basis in the recyclers, use of nonrecourse financing, and the circular nature of the transactions.

Thompson's letter concluded with the following paragraph:

> Notwithstanding the foregoing risks, however, the items on your Partnership K-1 may be used as is for the reason that both the valuation overstatement penalty and the substantial understatement of income tax penalty are waived whenever the taxpayer (i.e., you) can show there was a reasonable basis for the claims made and that such claims were made in good faith. The [offering] memorandum, as well prepared as it is, should be an adequate "reasonable basis" upon which to base the filing of your Form 3468. Additionally, I believe you may rely upon it in good faith notwithstanding this letter, for this letter is no more legally enforceable than the Memorandum.

After petitioner received Thompson's letter, petitioner prepared Form 3468 in his own hand, using the partially completed copy prepared by Thompson as a model. Petitioner then completed petitioners' Federal income tax return (Form 1040), which petitioners signed on April 11, 1983.

In preparing petitioners' tax return for 1982, petitioner followed his custom of preparing petitioners' returns himself without the assistance of a return preparer.[10]

I. Petitioners' Tax Returns

1. The Whitman Partnership

The tax benefits claimed by petitioners on their Federal income tax return for 1982, the initial year of investment in Whitman, exceeded their $15,000 investment in the partnership. Thus, on their 1982 return, petitioners claimed a regular

---

[10] Petitioner also prepared petitioners' tax return for 1983 without the assistance of a return preparer.

investment tax credit and energy tax credit in the aggregate amount of $17,511. Petitioners also claimed a loss in the amount of $11,852 for their distributive share of the partnership's reported loss for 1982. The investment credits and the partnership loss served to reduce petitioners' liability for Federal income tax as reported on their 1982 return by $23,240.[11]

### 2. Other Partnerships

Petitioners reported losses from partnerships other than Whitman on their income tax returns for 1982 and 1983, as follows:

| Partnership | 1982 | 1983 |
|---|---|---|
| University Associates | $589 | $554 |
| Winer Development | 255 | — |
| Columbian Oil & Gas | --- | 3,441 |
| Enterprise Energy | --- | 3,074 |

Petitioners did not report any income or gain in respect of any partnership on either their 1982 or 1983 tax return.

### J. The Partnership-Level Proceeding

Whitman is a so-called TEFRA partnership subject to the unified partnership audit and litigation procedures set forth in sections 6221 through 6233. See Tax Equity and Fiscal

---

[11] Petitioners also claimed a loss on their 1983 return in the amount of $594 for their distributive share of Whitman's reported loss for that year. The partnership loss served to reduce petitioners' tax liability for 1983 by $193.

The record does not reveal whether petitioners claimed losses from Whitman on their returns for years after 1983; however, the record does establish that petitioner never made a profit in any year from his investment in Whitman.

Responsibility Act of 1982 (TEFRA), Pub. L. 97-248, sec. 402(a), 96 Stat. 648. On May 30, 1989, respondent mailed a Notice of Final Partnership Administrative Adjustment (FPAA) to Sam Winer, the tax matters partner of the Whitman partnership, for each of the taxable years 1982 and 1983.[12] A copy of each FPAA was also mailed to petitioners.

The FPAA's advised petitioners of adjustments respondent proposed to make to the partnership returns (Forms 1065) filed by Whitman. Specifically, the FPAA's disallowed all deductions and credits claimed by Whitman in connection with its plastics recycling activities for 1982 and 1983.[13]

On June 22, 1989, a case was commenced in this Court at docket No. 14535-89 and captioned "Whitman Recycling Associates, Sam Winer, Tax Matters Partner, Petitioner v. Commissioner of the

---

[12] Respondent also mailed FPAA's to Winer for the taxable years 1984 and 1985, which years were also in issue as part of the partnership action described infra in the text.

[13] In October 1988, some 7 months before respondent mailed the FPAA's, respondent made the so-called Plastics Recycling Project Settlement Offer (the settlement offer). The settlement offer was made in writing to Winer as Whitman's tax matters partner. The terms of the settlement offer are described in detail in section "I" of the Background portion of Davenport Recycling Associates v. Commissioner, T.C. Memo. 1998-347, affd. 220 F.3d 1255 (11th Cir. 2000). Suffice it to say that the transmittal letter stated that the settlement offer would not be repeated and that the offer would expire 30 days from the date of the letter. Winer did not accept the settlement offer on behalf of the partnership. Accordingly, respondent mailed the FPAA's that are described above in the text.

Internal Revenue, Respondent".[14] Subsequently, on February 23, 1994, the Court entered decision in the Whitman case pursuant to the Commissioner's Motion for Entry of Decision under Rule 248(b). The Court's decision, which reflected the full concession by Whitman of all items of income, loss, and the underlying valuation used for the Sentinel EPS recyclers for tax credit purposes for 1982 and 1983, completely sustained the Commissioner's FPAA determinations for those years.[15]

At no time during the pendency of the proceedings in docket No. 14535-89 did petitioners file with the Court a notice of election to participate in the partnership action pursuant to Rule 245(b).

OPINION

We have decided many Plastics Recycling cases. Most of those cases have presented issues regarding additions to tax for negligence. See, e.g., Barlow v. Commissioner, T.C. Memo. 2000-339; Carroll v. Commissioner, T.C. Memo. 2000-184; Ulanoff v. Commissioner, T.C. Memo. 1999-170; Gottsegen v. Commissioner, T.C. Memo. 1997-314; Greene v. Commissioner, T.C. Memo. 1997-296;

---

[14] All of the limited partners of Whitman who had an interest in the outcome of the partnership proceeding were treated as parties to the proceeding. See sec. 6226(c) and (d). See also Title XXIV, Tax Court Rules of Practice and Procedure, regarding partnership actions.

[15] Similarly, the Court's decision completely sustained the Commissioner's FPAA determinations for 1984 and 1985.

Kaliban v. Commissioner, T.C. Memo. 1997-271; Sann v. Commissioner, T.C. Memo. 1997-259 n.13 (and cases cited therein), affd. Addington v. Commissioner, 205 F.3d 54 (2d Cir. 2000). We found the taxpayers liable for the additions to tax for negligence in nearly all of those cases.

I. Section 6653(a)(1) and (2) Negligence

Respondent determined that petitioners are liable for additions to tax under section 6653(a)(1) and (2) with respect to the underpayment attributable to petitioners' investment in Whitman. Petitioners have the burden of proof to show that they are not liable for the additions to tax. See Addington v. Commissioner, supra; Goldman v. Commissioner, 39 F.3d 402, 407 (2d Cir. 1994), affg. T.C. Memo. 1993-480; Luman v. Commissioner, 79 T.C. 846, 860-861 (1982); Bixby v. Commissioner, 58 T.C. 757, 791-792 (1972). See generally Rule 142(a); INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992); Welch v. Helvering, 290 U.S. 111, 115 (1933).[16]

Section 6653(a)(1) and (2) imposes additions to tax if any part of the underpayment of tax is due to negligence or intentional disregard of rules or regulations. Negligence is defined as the failure to exercise the due care that a reasonable

_____

[16] Cf. sec. 7491(c), effective for court proceedings arising in connection with examinations commencing after July 22, 1998. In the present cases, the examination of petitioners' income tax returns for 1982 and 1983 commenced well before July 22, 1998.

and ordinarily prudent person would exercise under the circumstances.  See Neely v. Commissioner, 85 T.C. 934, 947 (1985).  The pertinent question is whether a particular taxpayer's actions are reasonable in light of the taxpayer's experience, the nature of the investment, and the taxpayer's actions in connection with the transactions.  See Henry Schwartz Corp. v. Commissioner, 60 T.C. 728, 740 (1973).  In this regard, the determination of negligence is highly factual.  "When considering the negligence addition, we evaluate the particular facts of each case, judging the relative sophistication of the taxpayers as well as the manner in which the taxpayers approached their investment."  Turner v. Commissioner, T.C. Memo. 1995-363.

Under some circumstances, a taxpayer may avoid liability for negligence if reasonable reliance on a competent professional adviser is shown.  See United States v. Boyle, 469 U.S. 241, 250-251 (1985); Freytag v. Commissioner, 89 T.C. 849, 888 (1987), affd. 904 F.2d 1011 (5th Cir. 1990), affd. 501 U.S. 868 (1991). Reliance on professional advice, standing alone, is not an absolute defense to negligence, but rather a factor to be considered.  See Freytag v. Commissioner, supra.  For reliance on professional advice to excuse a taxpayer from negligence, the taxpayer must show that the professional had the requisite expertise, as well as knowledge of the pertinent facts, to provide informed advice on the subject matter.  See David v.

Commissioner, 43 F.3d 788, 789-790 (2d Cir. 1995), affg. T.C. Memo. 1993-621; Goldman v. Commissioner, supra; Freytag v. Commissioner, supra.

In making the investment in Whitman, petitioner contends that he reasonably relied on the advice of two individuals, namely, his brother and Winer.

A.  Petitioner's Reliance on Winer

Petitioner contends that before he invested in Whitman, he had a history of investing with Winer and that such investments were financially successful.  Therefore, petitioner argues, he was justified on relying on Winer's advice in deciding to invest in Whitman.  We disagree.

Although the record demonstrates that petitioner did invest in several Winer-promoted investments from 1979 to 1981, there is no evidence, other than petitioner's unsupported allegation, that such investments were financially successful.  In this regard, it is well established that the Court is "not required to accept the self-serving testimony of petitioner * * * as gospel." Tokarski v. Commissioner, 87 T.C. 74, 77 (1986).  See Niedringhaus v. Commissioner, 99 T.C. 202, 219-220 (1992).  It should have been a simple matter for petitioner to produce documentary evidence (e.g., investment reports, prior years' tax returns) to support his allegation.  However, he did not.  In this regard, it is also well established that a party's failure to introduce documentary

evidence that is within his possession or control and that he implies would be favorable to him, gives rise to the presumption that, if produced, such evidence would be unfavorable.  See Wichita Terminal Elevator Co. v. Commissioner, 6 T.C. 1158, 1165 (1946), affd. 162 F.2d 513 (10th Cir. 1947).  Furthermore, the documentary evidence introduced at trial suggests that petitioner's Winer-promoted investments may have been successful only in producing tax benefits.  Thus, on petitioners' 1982 return, petitioners claimed a partnership loss from Winer Development Co.; on petitioners' 1983 return, petitioners claimed partnership losses from two other oil and gas partnerships.  It is at least noteworthy that petitioners did not report any income or gain from any partnership on either their 1982 or 1983 tax return.

In addition, reliance on representations by insiders or promoters has been held to be an inadequate defense to negligence.  See Pasternak v. Commissioner, 990 F.2d 893, 903 (6th Cir. 1993) (reliance on promoter of tax shelter is not a defense to the negligence addition), affg. T.C. Memo. 1991-181; Leuhsler v. Commissioner, 963 F.2d 907, 910 (6th Cir. 1992)(even an unsophisticated taxpayer may not reasonably rely on "advice" from a promoter of a tax shelter); Goldman v. Commissioner, supra; LaVerne v. Commissioner, 94 T.C. 637, 652-653 (1990), affd. without published opinion 956 F.2d 274 (9th Cir., 1992),

affd. without published opinion sub nom. Cowles v. Commissioner, 949 F.2d 401 (10th Cir. 1991). Advice from such individuals "is better classified as sales promotion". Vojticek v. Commissioner, T.C. Memo. 1995-444. The rationale for this view is based on the insider's or promoter's self-interest, which makes such "advice" inherently suspect. See Addington v. Commissioner, 205 F.3d at 59 ("It is unreasonable for taxpayers to rely on the advice of someone who they should know has a conflict of interest."); Goldman v. Commissioner, 39 F.3d at 408; LaVerne v. Commissioner, supra at 652-653.

In the present cases, Winer's self-interest is clearly demonstrated by the offering memorandum. Thus, the offering memorandum stated: (1) Winer would receive a 1-percent interest in "all items of income, gain, deduction, loss or credit arising from the operations of the Partnership"; (2) Winer would receive $62,000 for administrative and other services to be paid from the proceeds of the private placement offering as "management fees"; (3) Whitman would pay "fees of purchaser representatives and selling commissions" from the proceeds of the offering in an amount equal to 10 percent of the aggregate price of the units; and (4) Winer could "retain as additional compensation all amounts not paid as purchaser representative fees or sales commissions in connection with the Offering". The incentives to Winer to tout the investment were therefore readily apparent.

At trial, petitioner admitted understanding that if he invested in Whitman, then Winer, as promoter, would receive a commission based on petitioner's purchase of an interest in the partnership.  Petitioner also admitted that he looked at the offering memorandum and therefore should have known, if he did not know in fact, that Winer stood to benefit financially in the other ways enumerated above.  See Addington v. Commissioner, 205 F.3d at 59.

Pleas of reliance have also been rejected when neither the taxpayer nor the adviser knew anything about the nontax business aspects of the contemplated venture.  See id. at 58 ("In general, it is unreasonable to rely on an adviser who lacks knowledge about the industry in which the taxpayer is investing."); Freytag v. Commissioner, supra; Beck v. Commissioner, 85 T.C. 557 (1985); see also Patin v. Commissioner, 88 T.C. 1086, 1131 (1987), affd. without published opinion 865 F.2d 1264 (5th Cir. 1989), affd. sub nom. Gomberg v. Commissioner, 868 F.2d 865 (6th Cir. 1989), affd. sub nom. Skeen v. Commissioner, 864 F.2d 93 (9th Cir. 1989), affd. per curiam without published opinion sub nom. Hatheway v. Commissioner, 856 F.2d 186 (4th Cir. 1988); Klieger v. Commissioner, T.C. Memo. 1992-734.  Insofar as Winer is concerned, Winer did not have an engineering background, and he was not an expert in either plastics materials or plastics recycling.  Moreover, Winer never represented that he possessed

specialized knowledge of the plastics recycling industry, and he had, at most, only limited experience in marketing recycling or similar equipment. Indeed, Winer's limited experience (at best) in marketing recycling or similar equipment was one of the business risks that the offering memorandum specifically identified.

In sum, we do not think that petitioner's professed reliance on Winer's advice was reasonable.

B. Petitioner's Reliance on His Brother

Petitioner also contends that he relied on his brother's advice in deciding to invest in Whitman and that such reliance was reasonable. Although the record demonstrates that petitioner relied on his brother, we do not think that such reliance was reasonable.

As previously stated, pleas of reliance have been rejected when neither the taxpayer nor the adviser knew anything about the nontax business aspects of the contemplated venture. E.g., Addington v. Commissioner, supra; Freytag v. Commissioner, supra; Beck v. Commissioner, supra; see also Patin v. Commissioner, supra; Kleiger v. Commissioner, supra. In the present cases, petitioner's brother had no specialized knowledge of the plastics recycling industry and had no expertise in appraising either the value of property in general or plastics recycling machines in particular. In fact, the record suggests that petitioner knew

that his brother had no knowledge regarding the value of the Sentinel EPS recyclers. Moreover, petitioner did not know whether his brother even talked to anyone in the plastics industry before giving him "advice". In addition, petitioner did not know whether, but rather merely assumed that, his brother read the offering memorandum before giving him "advice".

It is noteworthy that petitioner did not call his brother to testify at trial. Petitioner's failure to do so gives rise to the inference that his brother's testimony would not have been favorable to petitioner. See Mecom v. Commissioner, 101 T.C. 374, 386 (1993), affd. without published opinion 40 F.3d 385 (5th Cir. 1994); Pollack v. Commissioner, 47 T.C. 92, 108 (1966), affd. 392 F.2d 409 (5th Cir. 1968); Wichita Terminal Elevator Co. v. Commissioner, 6 T.C. 1158, 1165 (1946), affd. 162 F.2d 513 (10th Cir. 1947).

Petitioners rely on Dyckman v. Commissioner, T.C. Memo. 1999-79, for the proposition that reliance on a trusted friend or adviser (such as petitioner's brother) relieves a taxpayer from liability for negligence. That case, however, is clearly distinguishable from the present ones.

In Dyckman v. Commissioner, supra, we held for the taxpayers on the issue of negligence based on special and unusual circumstances, including the taxpayers' complete lack of sophistication in investment matters and the long-term

relationship of trust and friendship that existed between the taxpayers and their C.P.A. Also determinative was the fact that the taxpayers did not invest as a means of obtaining tax benefits; rather, their sole motivation was to provide for their retirement, and they were not even aware that their investment was in a partnership designed to produce tax benefits. Further, the taxpayers were not provided with any literature, such as an offering letter or prospectus, regarding their investment.

In contrast, petitioner is a relatively sophisticated investor and possessed investment experience at the time that he invested in Whitman. Moreover, petitioner was also provided with a copy of the offering memorandum. Furthermore, petitioner was aware that his investment in Whitman produced immediate tax benefits in excess of his investment. Indeed, the promise of such benefits was the principal factor that motivated petitioner to invest in Whitman.

For the foregoing reasons, petitioners' reliance on Dyckman v. Commissioner, supra, is misplaced. Likewise, petitioners' reliance on Zidanich v. Commissioner, T.C. Memo. 1995-382, is misplaced for essentially the same reasons.

In addition to the foregoing, we are not convinced that petitioner regarded his brother as a trusted adviser. First, the contacts between petitioner and his brother on financial matters appear to have been casual in nature, and those contacts were

invariably over the telephone.  Second, petitioner has never disclosed details regarding his own personal financial status to his brother.  Petitioner's reticence in making disclosures to his brother is illustrated by the following passage from the trial transcript:

> Q:  Mr. Barber, we've heard a lot about your brother.  You rely on him almost exclusively for investment advice?
>
> A:  I rely on him as a major [source] of advice.  As I indicated earlier I also have an Olde [brokerage firm] stockbroker that's done pretty good too.  But my brother's support goes back a long time because he's been an enrolled agent and tax preparer for a long time, and certainly whenever I have a complex tax question or things like that, I do go to him.
>
> Q:  Okay.  Did you ask your brother about how to prepare the form to attach to your 1982 return?
>
> A:  No, I did not.  I only ask him questions over the phone.  I don't show him my own personal financial data.  I do keep that separate from him.
>
> Q:  Okay.  So he doesn't have a full picture of your financial status, so to speak?
>
> A:  Probably not.
>
> Q:  So he doesn't know how much money you earn?
>
> A:  Right.
>
> Q:  He doesn't know all the different investments that you end up making?
>
> A:  I don't talk to him about my Olde stock, because that's through my stockbroker I do that.
>
> Q:  Okay.  So you call upon him when you want some advice from him?

A:   Right.   Complex tax questions, things like that.

In sum, we do not think that petitioner's professed reliance on his brother's advice was reasonable.

C.   Petitioner's Reliance on Thompson

Petitioner does not contend that he relied on Thompson in making the investment in Whitman.  However, after having made the investment, petitioner contends that he relied on Thompson in claiming the associated tax benefits on his income tax returns. Petitioner also contends that such reliance was reasonable.  We acknowledge that neither Thompson nor his firm had any relationship with either Winer or Whitman.  However, for the following reasons we disagree that petitioner's professed reliance on Thompson was reasonable.

First, Thompson was not an investment adviser.  Indeed, he did not consider himself qualified to provide investment advice, and his practice was not to provide such advice.  Thompson did not purport to, nor did he, provide petitioner with investment advice.  Cf. Anderson v. Commissioner, 62 F.3d 1266, 1268 (10th Cir. 1995) (wherein the taxpayers relied on their own investment adviser regarding the soundness of their investment), affg. T.C. Memo. 1993-607.

Second, Thompson did not have any specialized knowledge regarding the plastics recycling industry.  In addition, Thompson did not have any specialized knowledge regarding the nontax

business aspects of petitioner's Sentinel EPS recycler investment. Thompson was therefore in no position himself to evaluate either the technology of the Sentinel EPS recyclers or whether the Whitman partnership was a viable economic enterprise. See, e.g., <u>Addington v. Commissioner</u>, 205 F.3d at 58 ("In general, it is unreasonable to rely on an adviser who lacks knowledge about the industry in which the taxpayer is investing.").

Third, Thompson did not make any independent attempt to evaluate either the technology of the EPS recyclers or whether the Whitman partnership was a viable economic enterprise. He was therefore in no position to opine on either of these matters.

Fourth, Thompson had no knowledge of the value of the Sentinel EPS recyclers, and he made no independent attempt to determine their value. Yet Thompson recognized, and he so advised petitioner, that "the fair market value * * * of the Sentinel EPS Recyclers * * * is * * * the starting point for determining the amount of credits available to the Partnership."

Fifth, Thompson based his advice solely on the materials furnished to him by petitioner, namely, the offering memorandum and the 1982 Schedule K-1.

Sixth, Thompson regarded the Whitman investment to be "aggressive", and he so advised petitioner. At trial, Thompson described what "aggressive" meant:

A:  * * * So, yes, they [Whitman and its promoter] were making maximum use, pushing the limit right to the edge.  It was very aggressive or I wouldn't have said it was.  You know, you have to know how to deal with aggressive investments.  Doesn't mean it's wrong, just means you take your chance.

Q:  I'm sorry.  You said you must "take your chance"?

A:  You just take your chance.

Q:  And this is the kind of investment that you thought--

A:  How close can you walk to the line without getting caught or tripped.

Finally, Thompson's letter expressed so many misgivings, and was filled with so many qualifications, reservations, and disclaimers, as to undermine any contention that the letter justified petitioner's reporting position.  Thus, numerous "areas of concern" were identified in the letter.  First and foremost among such "areas of concern" was the value of the recyclers, which Thompson identified as "the starting point for determining the amount of credits available to the Partnership."  Thompson expressly advised petitioner that "I am not in a position to judge the FMV of the Recyclers".  Yet Thompson, even with his lack of appraisal skills, was able to conclude that "the valuation made in the Memorandum is challengeable."  He then went on to explain why:

First of all, with regard to * * * [Burstein's and Ulanoff's reports], neither evaluator appears to be primarily a property appraiser, and neither engages in an economic analysis of cost of production of the

> Recyclers, reasonable profit, comparables,
> capitalization of income, or other factors normally
> used in equipment appraisals.

In other words, no rational basis existed for the exorbitant value assigned to the recyclers in the offering memorandum.

At trial, Thompson testified that "I don't consider my letter to be a rousing endorsement of the investment", an assertion that can only be described as an understatement when one considers the conclusion expressed in the letter: "I believe you may rely upon [the offering memorandum] <u>notwithstanding this letter</u>, for this letter is no more legally enforceable than the Memorandum." (Emphasis added.)  We regard this conclusion as tantamount to a total disclaimer, a view that is supported by Thompson's testimony at trial:

> Q:  Is there any reservation that you have on this
> * * * [conclusion] of the letter?
>
> A:  Do I have a reservation?  You mean would I
> take anything back of what I said?
>
> Q:  Sure.
>
> A:  No, I don't think I gave very much away.
> There's nothing to take back.

Petitioner's contention that he regarded Thompson's letter as positive justification for claiming the tax credits and loss deductions is, of course, self-serving.  See <u>Tokarski v. Commissioner</u>, 87 T.C. at 77; <u>Niedringhaus v. Commissioner</u>, 99 T.C. at 219-220.  To accept petitioner's contention would require us to ignore the clear tenor of the letter and take several

statements out of context.  We are unwilling to do that.

As the trier of fact, "it is our duty to listen to the testimony, observe the demeanor of the witnesses, weigh the evidence, and determine what we believe."  Kropp v. Commissioner, T.C. Memo. 2000-148; cf. Diaz v. Commissioner, 58 T.C. 560, 564 (1972).  In the present cases, we are convinced that petitioner invested in Whitman principally because the investment offered immediate tax benefits in excess of his investment.  We are convinced that petitioner was determined to reap those benefits if at all possible.

Petitioner consulted with Thompson for two reasons.  First, petitioner was uncertain how to convert his share of the partnership's basis in the recyclers as reported on the 1982 Schedule K-1 into tax credits on his individual return.  This is borne out by the opening sentence of Thompson's letter, which states that petitioner retained the firm to review the offering memorandum "for the purpose of preparing and advising you with respect to Form 3468 to be filed with your 1982 tax return." (Emphasis added.)  This statement suggests that the filing of Form 3468 with the sought-after tax credits was virtually a foregone conclusion.

Petitioner also consulted Thompson because petitioner was sensitive to the magnitude of the tax benefits shown on his 1982 Schedule K-1, and he was concerned that the magnitude of those

benefits might expose his investment to be the tax shelter it clearly was.  In this regard, we are convinced that petitioner consulted Thompson in order to provide "cover" and "plausibility"; likewise, we are convinced that petitioner was determined to "interpret" whatever advice that he received as justification for the tax benefits that he had purchased.

In sum, we do not think that petitioner's professed reliance on Thompson was reasonable.  See, e.g., Addington v. Commissioner, 205 F.3d 54 (2d Cir. 2000), affg. Sann v. Commissioner, T.C. Memo. 1997-259.

D.  Other Matters

Petitioners contend that investors such as themselves should not be burdened with the obligation of performing independent investigations of the ventures in which they invest.  In petitioners' view, such a requirement would impose an economic burden and prevent taxpayers such as themselves from investing. As applicable to the present cases, however, this argument is flawed in that it virtually presumes, among other things that: Petitioner should not have been expected to carefully read the offering memorandum; petitioner should not have been expected to consider the numerous caveats and warnings regarding the business and tax risks inherent in the Whitman investment; petitioner was not principally motivated by the prospect of receiving immediate tax benefits in excess of his investment; and petitioner was

justified in relying on an individual whom he knew had a conflict of interest.

As applied to the present cases, petitioners' argument is also flawed in that it ignores the various red flags that should have alerted petitioner, a relatively sophisticated investor with a technical background, that the Sentinel EPS recyclers were overvalued and independent expert advice was therefore required. Obvious red flags included the exorbitant cost of the recyclers (i.e., $7 million) and the fact that the Whitman transactions, as described in the offering memorandum, were to be executed simultaneously in what was nothing other than a circular flow of apparent payments made only through bookkeeping entries.

Finally, mention should be made of two Plastics Recycling cases that were decided after petitioners' briefs were filed, namely, Thompson v. United States, 223 F.3d 1206 (10th Cir. 2000), and Klein v. United States, 94 F. Supp.2d 838 (E.D. Mich. 2000).

In Thompson v. United States, supra, the Court of Appeals for the Tenth Circuit held that the District Court did not abuse its discretion in instructing the jury that reasonable, good-faith reliance on the advice of a professional adviser constitutes a defense to negligence within the meaning of section 6653.  This holding served to uphold the jury's verdict in favor of the taxpayers on the issue of negligence.

In Thompson v. United States, supra, the Government relied heavily on the unpublished opinion of the Court of Appeals for the Tenth Circuit in a similar Plastics Recycling case, Gilmore & Wilson Constr. Co. v. Commissioner, 166 F.3d 1221 (10th Cir. 1999), affg. Estate of Hogard v. Commissioner, T.C. Memo. 1997-174.  The Court of Appeals dismissed the Government's  assertion that its holding in that case was dispositive of the issue before it:

> In that case we reviewed the tax court's factual determination, made after a bench trial, that the taxpayers were negligent.  Here we consider the more limited question of whether a reliance instruction was warranted.  Had we been presented with such a question in Gilmore & Wilson, we would likely have upheld the instruction.  See id. at *5 ("The evidence introduced, both at trial and through stipulation, presents a close question regarding whether taxpayers were negligent.") For this reason, the government's reliance on Gilmore & Wilson is misplaced. [Thompson v. United States, supra at 1210; fn. ref. omitted.]

In the present cases, we have considered petitioners' contention regarding reliance.  However, we have concluded, based on the totality of the facts and circumstances presented at trial, that petitioners' professed reliance on Winer, petitioner's brother, and Thompson was not reasonable.  Accordingly, we regard Thompson v. Commissioner, supra, as distinguishable from the present cases.

In Klein v. United States, supra, the District Court denied the Government's motion for summary judgment on the issue of the taxpayers' liability for additions to tax for negligence.  The

District Court held that on the record before it, the issue of negligence could not be decided as a matter of law but rather was an issue to be decided by the trier of fact.

In the present cases, we have addressed the issue of negligence as an issue of fact, which we have decided based on the totality of the facts and circumstances presented at trial. Thus, Klein v. United States, supra, is distinguishable from the present cases.

E.  Conclusion

Upon consideration of the entire record, we hold that petitioners are liable for the additions to tax for negligence under section 6653(a)(1) and (2).  Respondent is therefore sustained on this issue.

II.  The Plastics Recycling Project Settlement Offer

Petitioners contend that they are entitled to the terms of the Plastics Recycling Project Settlement Offer.  See Davenport Recycling Associates v. Commissioner, T.C. Memo. 1998-347, affd. 220 F.3d 1255 (11th Cir. 2000).

It should be recalled that in October 1988, respondent made the settlement offer, in writing, to Winer as the tax matters partner of the Whitman partnership.  Respondent's transmittal letter stated that the settlement offer would not be repeated and that the offer would expire 30 days from the date of the letter. Winer did not accept the settlement offer on behalf of the

partnership.  Respondent then mailed the notices of final partnership administrative adjustment; Winer commenced the partnership action at docket No. 14535-89; and, ultimately, the Court entered decision, pursuant to the Commissioner's motion under Rule 248(b), which completely sustained the Commissioner's FPAA determinations.

Petitioners allege that they were never informed of the settlement offer by respondent at the time that the offer was made.  Respondent counters that the settlement offer was made to Winer as Whitman's tax matters partner and that any failure by Winer to inform all of the limited partners of the existence of the offer does not require respondent to renew the offer.  We agree with respondent.

There is no statutory or regulatory provision that obligates respondent, when making a settlement offer to the tax matters partner of a TEFRA partnership, to provide notice to the partnership's limited partners of the fact of such offer.  To the contrary, section 6223(g) provides, in part, that "the tax matters partner of a partnership shall keep each partner informed of all administrative and judicial proceedings for the adjustment at the partnership level of partnership items."  In other words, to the extent that Whitman's limited partners were entitled to notice regarding respondent's making of the October 1988 settlement offer, the duty to provide such notice lay with Winer

and not with respondent.  See also sec. 301.6223(g)-1T(b)(1)(iv),
Temporary Proced. & Admin. Regs., 52 Fed. Reg. 6786 (March 5,
1987), which specifically obligates the tax matters partner to
furnish to the partners information with regard to the acceptance
by the Commissioner of any settlement offer.[17]  Cf. Computer
Programs Lambda v. Commissioner, 90 T.C. 1124, 1126-1127 (1988),
regarding the central role played by, and the duties imposed on,
the tax matters partner during litigation at the partnership
level.

Further, the fact that Winer may have failed in his duty to
provide notice regarding the fact of respondent's settlement
offer does not serve to "revive" the offer insofar as petitioners
are concerned.  In this regard, section 6230(f) expressly states:

> The failure of the tax matters partner * * * or any
> other representative of a partner to provide any notice
> or perform any act required under this subchapter
> [sections 6221-6233] or under regulations prescribed
> under this subchapter on behalf of such partner does
> not affect the applicability of any proceeding or
> adjustment under this subchapter to such partner.

Conclusion

Petitioners have made other arguments that we have
considered in reaching our decision.  To the extent that we have
not discussed those arguments, we find them to be irrelevant or

---

[17]  Petitioners also appear to mistakenly place on the
Commissioner the duty to serve copies of a Rule 248(b) motion in
a partnership action.  However, Rule 248(b)(3) squarely places
this duty on the tax matters partner.  See also sec. 6230(l).

without merit.[18]

To reflect our disposition of the disputed issues, as well as petitioners' concessions, see <u>supra</u> note 1,

<u>Decisions will be entered</u>
<u>for respondent</u>.

---

[18] We also decline to consider arguments for which there is no factual predicate in the evidentiary record.  See Rule 143(b)("statements in briefs * * * do not constitute evidence."). Further, insofar as additional interest under sec. 6621(c) may be concerned, we refer petitioners to sec. 6621(c)(3)(A)(i), (v), as well as <u>Barlow v. Commissioner</u>, T.C. Memo. 2000-339.